UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-00754-RPM

RICHARD SIEGEL
          Plaintiff,
v.

CENTRES INC.
          Defendant.

---

## FIRST AMENDED COMPLAINT

    Plaintiff Richard Siegel, through his attorneys Richard Rosenblatt & Associates L.L.C., complains against Defendant Centres, Inc. as follows:

### I. THE PARTIES

1.     Plaintiff Richard (also known as Dick) Siegel (hereinafter cited as "Siegel") resides in Aurora, Colorado. He has been engaged in the business of commercial real estate for over 44 years. At all relevant times of this dispute, Siegel's principal place of residence and business have been Denver, Colorado.

2.     Centres, Inc. (hereinafter cited as "Centres") is engaged in the business of retail real estate development nationally, with an expertise in build to suit and fee development roll-out programs. Centres is incorporated in Wisconsin. Its main offices and principal place of business is Miami, Florida.

3.     At all relevant times, Ken Karl has been the CEO and David Charlton the President of Centres.



## II. JURISDICTION

4.  This Court has jurisdiction pursuant over this matter by virtue of 28 U.S.C. §1332 as the parties in this matter are citizens or subjects of different States and the sum or value of Plaintiff's claims exceeds $75,000. Venue is proper in this District because Plaintiff resided and worked in this District, and acts and omissions of the parties occurred in this District.

## III. GENERAL ALLEGATIONS

**A. Development Agreement and February 23, 2006 Promise.**

5.  In August 2004, Centres and Plaintiff executed a written agreement entitled "Development Agreement" (the "Development Agreement") to address their arrangement with regard to prospective development projects.

6.  The Development Agreement provided that the agreement could "be terminated by Centres or Siegel upon sixty (60) days written notice to the other. In the event of termination, "any Projects that have been acquired by a Company formed under this Agreement shall be developed and completed pursuant to their respective Operating Agreements."

7.  By letter from Centres to Plaintiff dated February 21, 2006, Centres gave notice to Plaintiff that it was terminating the Development Agreement, effective 60 days thereafter, on April 22, 2006.

8.  Shortly after receipt of Centres' notice of termination of the Development Agreement, Plaintiff requested information as to how the termination of the Development Agreement would affect his relationship with Centres and the projects which were still being pursued.

2

9. On or about February 23, 2006, Karl told Plaintiff in a telephone conversation that although the agreement had been formally terminated, "nothing would change" with regard to the relationship and that the arrangement would continue as if there were no termination.

10. In response to Plaintiff's request for something in writing verifying that "nothing has changed," on February 23, 2006, Centres described the parties' arrangement in an e-mail he forwarded to Plaintiff which stated:

> This e-mail is to confirm that for any development deal that you present to Centres, Inc, in which you are the procuring reason/relationship, then you will be entitled to a 50% equity position in each separate project that we decide to move forward with (i.e. closing). Please note that the 50% may be reduced for certain transactions in which an additional broker/party is awarded/allocated a portion of your equity position (i.e. NAI deals – Finns get 25%) due to their involvement or relationship that is meaningful to the development project(s).

11. In a subsequent e-mail from the president of Centres on the same date (February 23, 2006), Plaintiff was informed that "We are fine for now with leaving your representation the same (Centres-Siegel and NAI/Centres)."

**B. Agreement Covering NAI Deals**

12. New America Network Inc. d/b/a NAI Global ("NAI") operates a real estate brokerage network of over 3,500 professionals in the U.S. and 40 other countries. It is headquartered in Princeton, N.J. At all relevant times, Gerald Finn has been the Chairman and founder, Jeff Finn the President and Chief Operating Officer and Ed Finn the Senior VP and General Counsel of NAI.

13. In January 2005, solely through the introduction and efforts of Plaintiff, Centres CEO Ken Karl, NAI CEO Jerry Finn and Chief Operating Officer Jeffrey Finn and

3

Plaintiff, met at NAI headquarters in Hightstown, New Jersey to discuss establishing a relationship to develop commercial retail projects.

14. Plaintiff, Centres, and NAI entered into negotiations to form an alliance to generate additional development Projects to benefit all three parties (the "NAI Group Agreement").

15. The first draft of the proposed agreement, drafted and circulated by Centres included Plaintiff as one of the persons/entities that would receive an interest in developed projects but did not include him as a party to the agreement. However, Centres' President, David Charlton, informed Plaintiff and NAI that Centres anticipated including Plaintiff as a party to the final agreement.

16. Nonetheless in subsequent drafts Siegel was not included as a party to this agreement.

17. Centres and NAI entered a separate written agreement on May 25, 2005 ("NAI Agreement"). Under the NAI Agreement, NAI would receive 25% of the profits with Centres receiving the remaining 75%. Though Plaintiff was not a party to the NAI Agreement, paragraph 22 of that Agreement stated that:

> The parties acknowledge that they were introduced and the relationship resulting in this Alliance Agreement was originated by Richard Siegel.

18. The NAI Agreement had a two year term (through April 31, 2007) with automatic renewals of one year unless terminated by either party. Despite this two year agreement, either party could terminate at any time on 30 days written notice.

19. However, as provided in paragraphs 9, 10 and 14 of the NAI Agreement, even after the NAI Agreement was terminated, if an NAI opportunity resulted in Centres becoming developer for a client referred by NAI, NAI was entitled to an appropriate

4

portion of profits "for any projects that originated with such developer client within the one year" after termination of the Agreement (Section 9). Further, if NAI or any of its members "introduced CENTRES to a relationship that result[ed] in an ongoing and continuous service to the client by CENTRES, CENTRES shall compensate NAI and the NAI member as if this Agreement were still in full force and effect for a period of five (5) years from the date of termination." (Section 10).

20. In response to Plaintiff's inquiries as to his interest in the NAI Agreement, Plaintiff was told by Centres, both verbally and in e-mails, that the agreement that Centres, Plaintiff and NAI had negotiated would be honored and he would receive 25% of any NAI Agreement deals, but that his arrangement would be directly with Centres and Plaintiff would take his 25% from the 75% allocated to Centres under the NAI Agreement. Centres assured Plaintiff that the arrangement would be memorialized in an additional written agreement.

21. On June 10, 2005, Plaintiff again inquired as to the status of the additional written agreement. That same day, he received an e-mail from Hava B. Villaverde, Vice President and in-house counsel for Centres stating that "It is on my 'to do' list."

22. On June 17, 2005, Centres sent Plaintiff a "letter agreement with respect to NAI Agreement executed May 25, 2005 between Centres and New America Network, Inc. ('NAI')" (referred to herein as the "Centres/Siegel Letter Agreement").

23. The Centres/Siegel Letter Agreement provided that:

> When NAI and Centres enter into an NAI Opportunity (as such term is defined in the NAI Agreement), NAI (comprised of NAI Global and an NAI member), Centres and Siegel shall create a single purpose entity (the "Opportunity Entity") in which Karl owns one half (50%) of the interest inapplicable Opportunity Entity, NAI owns one quarter (25%) of the interest and in most

5

    cases, Siegel owns one quarter (25%) of the interest [and s]uch Opportunity Entity shall operate during the course of an NAI Opportunity as set forth in the NAI Agreement.

24. The Centres/Siegel Letter Agreement also provided that the arrangement would continue "[f]or as long as the NAI Agreement remains in force Siegel will be considered a member or partner of each NAI Opportunity unless, at any time, Siegel violates the terms and conditions of the NAI Agreement."

25. On June 20, 2005, Plaintiff completed execution of the Centres/Siegel Letter Agreement and on that day he faxed and mailed the fully executed Centres/Siegel Letter Agreement back to Centres.

26. Subsequent to Plaintiff's execution of the Centres/Siegel Letter Agreement, there was numerous written communications supporting the existence of an agreement between Centres and Siegel that provided Siegel with a share of the profits in NAI Opportunities.

27. These written communications included:

    a. July 16, 2005 e-mail from Siegel to NAI members, with a copy to Ken Karl, answering questions concerning the NAI/Centres agreement.

    b. August 28, 2005 e-mail from Siegel to Karl and Charlton listing "all deals that we have working" and among those listed were Bridgestone/Firestone projects.

    c. September 7, 2005 e-mail from Centres representative Rosa Nunez to Siegel, with Charlton copied, with a list of NAI projects. This list included Bridgestone/Firestone.

    d. September 7, 2005 e-mail from NAI's Edward Finn to Charlton, with Siegel copied, stating that projects, including Bridgestone/Firestone, were listed on

6

    NAI's "Real Trac OnLine" system. "Real Trac OnLine" is a proprietary technology platform operated by NAI that provides its clients with clear and customized report benchmarking on projects, transactions and leases.

e. September 13, 2005 e-mail from Charlton to Siegel and Edward Finn with a draft of a development agreement with Bridgestone/Firestone attached. In the body of the e-mail, Charlton states that this is "for your files" and ends the e-mail by stating that "I trust that these type of documents are only available for our group."

f. November 3, 2005 e-mail from Siegel to Karl, attaching an e-mail from NAI's Jeffrey Finn to NAI's Kim Kocur, Ted Parcel and Siegel in which Finn states that have build to suit partner that "would be perfect to handle the Hertz locations and tells Kocur to contact Siegel who "is now in partnership with us to drive the Centres relationship."

g. November 8, 2005 e-mail from Charlton to Siegel attaching draft estimate for Hertz location and requesting that Siegel forward to his contact.

h. November 9, 2005 e-mail from Charlton to Siegel regarding the latest update on the status of Bridgestone projects that Centres working on.

i. January 18, 2006 e-mail from NAI's Linda Battistelli to Siegel and Charlton, copied to Karl and Parcel regarding NAI Global and Centres Inc. Process Outline. According to the e-mail the purpose of this outline was to "clarify what steps need to be taken to keep everyone informed on activities between NAI Global and Centres." Step 4 of the process outline includes Dick Siegel.

j. February 9, 2006 e-mail from Charlton to Siegel regarding update on Bridgestone/Firestone Projects. According to Charlton he would not normally

    send status of such projects to people that he does not have relationship with on such projects.

  k. February 23, 2006 e-mail from Charlton to Siegel responding to an e-mail from Ed Finn concerning the commissions to be received by NAI brokers.

  l. February 23, 2006, e-mail from Charlton to Siegel which states:

> …to confirm that for any development deal that you present to Centres, Inc, in which you are the procuring reason/relationship, then you will be entitled to a 50% equity position in each separate project that we decide to move forward with (i.e. closing). <u>Please note that the 50% may be reduced for certain transactions in which an additional broker/party is awarded/allocated a portion of your equity position (i.e. NAI deals – Finns get 25%) due to their involvement or relationship that is meaningful to the development project(s).</u> (underline added)

  m. April 13, 2006 e-mails between Edward Finn and Charlton in which Finn asked Charlton "how is Dick [Siegel] taken care of" and Charlton responded that Siegel "gets his equity share of each NAI deal."

  n. May 5, 2006 letter from Ed Finn to David Charlton in which Finn stated, in part, that on Bridgestone/Firestone projects Siegel would receive 22.5% of the profits.

28. By letter from Centres to NAI dated May 4, 2006, Centres terminated the NAI Agreement, effective 30 days thereafter, on June 4, 2006.

29. On May 22, 2006, Centres and NAI entered into an agreement which provided, in relevant part:

> Centres will compensate NAI Global its equity share … for each Bridgestone/Firestone project, as stipulated under Section 9 of the Alliance Agreement.
>
> In addition, any relationship or transaction that Centres moves forward with, which originated through NAI Global while the Alliance Agreement was in full force and effect, shall be treated as provided in this Agreement.

8

### C. Bridgestone/Firestone Projects and Hertz Project

30. Through the efforts of Siegel and NAI, Centres has been and continues to develop commercial retail projects for Bridgestone/Firestone and for Hertz.

31. By letter dated November 15, 2006, Counsel for Plaintiff inquired as to the status of the ten Bridgestone projects.

32. By e-mail dated November 20, 2006, Charlton responded to Plaintiff's counsel that "The NAI/Centres Alliance Agreement was terminated on May 22, 2006. Under the Termination provision, NAI will receive its equity share for any deals that originate within one year of the termination."

33. Charlton admits that NAI shall receive its profits on any Bridgestone/Firestone Projects and Hertz Projects that "originate" within one year of the termination of the NAI Agreement.

34. However, Centres continues to refuse to provide a proper accounting or to even acknowledge that Plaintiff has any interest in such development projects.

35. Centres has generated, or will generate, fees and/or profits on the Bridgestone/Firestone Projects which fees and profits have or will exceed $75,000.

36. Centres has pursued at least one project with Hertz Corporation which have generated, or will generate, fees or profits that will exceed $75,000

### IV. CLAIMS FOR RELIEF

#### A. FIRST CLAIM FOR RELIEF:
#### Centres/Siegel Letter Agreement - Breach of Contract

37. Plaintiff incorporates all allegations set forth in paragraphs 1 through 36 as if fully set forth herein.

38. Pursuant to the Centres/Siegel Letter Agreement, Plaintiff is entitled to 25% of the fees or profits generated by any Project pursued by Centres <u>under the NAI Group Agreements.</u>

39. Numerous Bridgestone/Firestone Projects and one Hertz project have been and are being pursued by Centres and are covered by the NAI Group Agreements.

40. Notwithstanding Plaintiff's successful performance under the Centres/Siegel Letter Agreement, Centres has materially breached this Agreement by failing to (a) account to Plaintiff for the income generated by one or more Bridgestone/Firestone Projects and Hertz Project, and (b) pay to Plaintiff his present and future share of profits and fees generated as a result of the Bridgestone/Firestone Projects and Hertz Project.

41. As a direct result of Centres' material breaches with regard to the Bridgestone/Firestone Projects and Hertz Project, Plaintiff has suffered damages in an amount of greater than $75,000.

### B. SECOND CLAIM FOR RELIEF:
### <u>February 23, 2006 Novation</u>

42. Plaintiff incorporates all allegations set forth in paragraphs 1 through 41 as if fully set forth herein.

43. The February 23, 2006 e-mail from Centres to Siegel constitutes a novation of the Development Agreement effective as of that date.

44. Pursuant to this novation, Siegel is entitled to 25% of any profits and equity generated on any Projects pursued by Centres in which Siegel was a procuring reason/relationship and are part of the NAI deal.

45. Bridgestone/Firestone Projects and the Hertz Project are part of the NAI deal and Siegel was a procuring reason/relationship for these Projects.

10

46. Notwithstanding Plaintiff's successful performance under this Agreement, Centres has materially breached this Agreement by failing to (a) account to Plaintiff for the income generated by one or more Bridgestone/Firestone Projects and Hertz Project, and (b) pay to Plaintiff his present and future share of profits, fees and equity generated as a result of the Bridgestone/Firestone Projects and Hertz Project.

47. As a direct result of Centres' material breaches with regard to the Bridgestone/Firestone Projects and Hertz Project, Plaintiff has suffered damages in an amount of greater than $75,000.

### C. THIRD CLAIM FOR RELIEF:
### NAI Group Agreements – Anticipatory Repudiation

48. Plaintiff incorporates all allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

49. In response to Plaintiff's request for information regarding the Bridgestone/Firestone Projects, and any other projects being pursued by Centres under the NAI Group Agreements, the president of Centres, David Charlton communicated to Counsel for Plaintiff on November 20, 2006 that "The only project that Mr. Siegel may have any interest in is the remaining funds due from the Boulder Project relating to the 2006 CAM reconciliation."

50. Centres has pursued and is pursuing and developing projects with Bridgestone/Firestone and Hertz, which projects fall within of the scope of the NAI Group Agreements and/or the February 23, 2006 agreement..

51. The statement of David Charlton acts as a clear repudiation of Centres obligation to share profits and equity with Plaintiff on Bridgestone/Firestone Projects and Hertz

Project, as such projects fall within the scope of the NAI Group Agreements and/or February 23, 2006 agreement.

52. As a result of Centres repudiation of its obligations to Siegel under the NAI Group Agreements and/or February 23, 2006 agreement, Plaintiff has been damaged in an amount greater than $75,000.

D. **FOURTH CLAIM FOR RELIEF:**
   **NAI Group Agreements - Breach of Duty of Good Faith and Fair Dealing (under contract law)**

53. Plaintiff incorporates all allegations set forth in paragraphs 1 through 52 as if fully set forth herein.

54. Under principals of contract law and equity, Centres is required to exercise good faith and deal fairly and honestly and to act consistent with the intent of the parties, as set forth in the NAI Group Agreements and/or February 23, 2006 agreement, to share the benefits derived from any development project generated pursuant to the NAI Group Agreements and/or February 23, 2006 agreement..

55. Plaintiff acted in good faith by identifying and pursuing development projects with Bridgestone and other retail organizations pursuant to understandings and agreement between Centres Inc. and Plaintiff.

56. Centres acted in bad faith by claiming that no projects originated out of the NAI Group Agreements and/or February 23, 2006 agreement. .

57. As a result of Centres' breach of its obligations of good faith and fair dealing, Plaintiff has been damaged in an amount greater than $75,000.

WHEREFORE, Plaintiff Richard Siegel prays for judgment against the Defendant Centres Inc. and an Order directing Defendant, its officers, agents and employees to:

1. Comply with and specifically perform all agreements between Centres Inc. and Siegel;

2. Pay Siegel his share of present and future profits arising from Centres' development of Bridgestone/Firestone Projects and a Hertz Project;

3. Pay Siegel all prejudgment interest, costs of this action and for such other remedies as is appropriate.

                                         Respectfully submitted,

Plaintiff's Address
2480 South Oswego Street
Aurora Colorado 80014

                                        ____s/Richard Rosenblatt_____
*Richard Rosenblatt*
*Stanley M. Gosch*
RICHARD ROSENBLATT & ASSOCIATES LLC
8085 E. Prentice Ave.
Greenwood Village CO 80111
303-721-7399
720-528-1220 (fax)
rrosenblatt@cwa-union.org
sgosch@cwa-union.org

lr opeiu5/afl-cio