IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 07-cv-00754-RPM-CBS

RICHARD SIEGEL,

    Plaintiff,

v.

CENTRES, INC.,

    Defendant.

---

FINDINGS, CONCLUSIONS AND ORDER FOR JUDGMENT

---

After a bench trial on June 9, 2011, this court made findings and conclusions addressing the two issues identified in the Pretrial Order entered on March 23, 2011, (Doc. 55). In the Findings And Conclusions On Liability Issues, (Doc. 62), the Court decided that there was an agreement between Richard Siegel and Centres, Inc. by which Siegel earned a net profit interest in any venture completed by Centres as a result of the action of an NAI member presenting the opportunity to Centres without any additional work on that project by Siegel and that a project originated within the terms of the Alliance Agreement between Centres and NAI when Bridgestone/Firestone approved a site for a store before June 4, 2007, a year after termination of the NAI Alliance Agreement.

On March 20, 2009, the parties entered into a Stipulation for Appointment of Special Master (Doc. 35) to review financial information and prepare a report concerning profits, losses and "dead deal costs" associated with the defendant's development and operation through

disposition of identified projects. Pursuant to that stipulation, Magistrate Judge Shaffer entered an Order Appointing Special Master (Doc. 43), on June 22, 2009, naming John R. Armour, C.P.A. to perform the following duties:

1. The Plaintiff claims to be entitled to lost profits on the development of certain real estate projects allegedly developed by the Defendant. The Plaintiff bases his claim on an "Alliance Agreement" dated May 25, 2005 and a letter from the Defendant dated June 17, 2005.

2. Pursuant to those documents the Plaintiff claims the right to 25% of the net profits from fourteen real estate development transactions after deduction of his share of "dead deal costs" (costs incurred in attempting to locate other potential projects for the same clients but which projects did not proceed to the development phase). For purposes only of the Special Master's report, the Special Master shall assume that Plaintiff is entitled to 25% of net profits less Plaintiff's share of "dead deal costs".

3. The Defendant's liability for any damages has not been determined nor is the determination of liability the responsibility of the Special Master.

4. The Special Master shall investigate and form an opinion as to the amount of net profit, if any, received or more likely than not to be received as a result of each individual project and the "dead deal costs" incurred. The "dead deal costs" taken into consideration shall be identified by date and amount and shall include an explanation of the purpose and context of the expenditure and be associated with a specific undeveloped project.

Mr. Armour submitted his report to the Magistrate Judge and the parties.

A pretrial conference was held on November 10, 2011, resulting in an agreed Final Pretrial Order Regarding Damages Phase, (Doc. 69). The parties identified issues they believed were raised by Mr. Armour's report. Evidence centering on those issues was submitted on February 13, 2011.

Mr. Armour's report was received as Exhibit 40 and the parties agreed that it and his testimony were to be considered as opinions under F.R.E. 702.

Upon consideration of the evidence, the following findings and conclusions have been reached.

Siegel's interest in the seven identified properties is derivative from the Alliance Agreement between NAI and Centres, dated May 25, 2005, Ex. 4.  In that contract, the parties established a working relationship with NAI brokers to assist Centres in pursuing opportunities to "build to suit" (BTS) facilities for retail commercial businesses.

In paragraph 7 of the Agreement, after providing for commissions for sales transactions when NAI is the source of a BTS opportunity which Centres pursues, the following language appears:

> In addition, CENTRES and the NAI will share in the profits of the venture which CENTRES pursues in connection with the BTS opportunity, with NAI receiving twenty-five percent (25%) of the net profits of each such venture.
>
> Ex. 4 p. PO 122.

Paragraph 8 is relevant to this dispute.

> 8.  CENTRES and NAI hereby acknowledge and agree that CENTRES and/or Kenneth B. Karl shall serve as the equity partner in any transaction resulting from an NAI Opportunity hereunder and that CENTRES and/or Kenneth B. Karl shall provide all capital and bear all expenses required to pursue any NAI Opportunity pursuant to this Agreement.  Accordingly, in connection with the transactions contemplated hereunder, in the event that CENTRES makes advances for transactions that are not brought to fruition for any reason or which result in a loss, all such advances made by CENTRES or actual losses incurred by CENTRES shall be deemed "dead deal costs."  In the event such dead deal costs are incurred by CENTRES with respect to a particular transaction, NAI shall bear a portion of such dead deal costs from its share of the proceeds of the next succeeding transaction to which NAI is entitled to a share of proceeds under Section 7 of this Agreement.  The portion of dead deal costs to be borne by NAI shall be the same as the portion of the gain it was entitled to receive had the transaction causing the dead deal costs resulted in a gain.  In no event shall NAI be liable for dead deal costs other than as a reduction to its profit share of a subsequent profitable transaction.  The

      following examples are intended to indicate how dead deal costs will be handled.

Ex. 4 p. PO 122.

The contract between the plaintiff and Centres is in the form of a letter from David K. Charlton, president of Centres, to Richard Siegel, dated June 17, 2005. (Ex. 18). It reads, in its entirety, as follows:

Dear Dick:

      Please find a copy of the NAI Agreement attached hereto for your files. This letter is written to confirm our understanding with respect to the Siegel and Centres relationship as it relates to the NAI Agreement.

      When NAI and Centres enter into an NAI Opportunity (as such term is defined in the NAI Agreement), NAI (comprised of NAI Global and an NAI Member), Centres and Siegel shall create a single purpose entity (the "Opportunity Entity") in which Ken Karl owns one half (50%) of the interest in the applicable Opportunity Entity, NAI owns one quarter (25%) of the interest and, in most cases, Siegel owns one quarter (25%) of the interest. Such Opportunity Entity shall operate during the course of an NAI Opportunity as set forth in the NAI Agreement.

      With respect to each Opportunity Entity, Kenneth B. Karl shall serve as the equity partner and Centres shall serve as the manager or general partner of the applicable Opportunity Entity. Generally, profits for each venture shall be taken by each party in the percentages set forth above pursuant to the operating agreement for the Opportunity Entity and as set forth in the NAI Agreement. Losses shall be allocated pursuant to the scheme established for "dead deal costs" in the NAI Agreement as follows: if Centres makes advances for transactions that are not brought to fruition or result in a loss, Siegel will bear a portion of the dead deals costs from its share of the proceeds of the next succeeding transaction in which Siegel would be entitled to share in proceeds. The portion of dead deal costs which is to be borne by Siegel shall be the same as the portion of the gain Siegel was entitled to receive had the transaction causing such dead deal costs resulted in a gain.

      For so long as the NAI Agreement remains in force Siegel will be considered a member or partner of each NAI Opportunity unless, at any time, Siegel violates the terms or conditions of the NAI Agreement. Centres and

Siegel each acknowledge and agree that they shall conduct each NAI Opportunity fully in accordance with the requirements of the NAI Agreement.

Ex. 18 PO 122.

Centres terminated the Alliance Agreement in accordance with its terms by a notice, dated May 4, 2006, effective June 4, 2006. (Ex. 13). In response, on May 5, 2006, Edward Finn of NAI sent a letter of acknowledgment to Charlton and identified transactions which were being pursued as of the date of his letter.

Centres' decision to terminate the Alliance Agreement was made after rejecting an NAI effort to increase its compensation by a modification of the Agreement. The negotiations concerning that proposal are contained in e-mail exchanges between Ed Finn and Charlton, contained in Exhibit 34.[1] The following statements by Charlton are significant:

> First, in accordance with my conversations and emails with Ed, we are all in agreement with the following:
> 1. NAI member finds a site Equity share only
> 2. NAI member finds single tenant Equity share only
> 3. NAI member finds site & tenant Bonus Commission & Equity share
> 4. NAI member finds tenant for Multiple sites, but not involved in site selections
>    Equity share only
> 5. NAI member finds tenant for Multiple sites & involved in site selections
>    Bonus Commission & Equity share
>
> For example, Bridgestone (BFS) would fall under #4, as BFS has their own brokers that we must use (until something changes from their side). This was confirmed in yesterday's conference call and prior emails.
>
> The Hampton, GA - if NAI brings tenants to the table that allow Centres to develop the project (NAI) found the site), then #3 would apply; otherwise if Centres moves forward without any NAI directed tenants, then #1 would apply.

---

[1] Siegel had received copies of earlier e-mails and the quoted language is in response to a question from Ed Finn, "How is Dick Siegel taken care of in these transactions?"

Second, and probably the biggest concern, is the situation regarding NAI Global (corporate) clients.  It is clear that NAI must collect some fee/commission on these deals, as that is how NAI Global (not members) is structured.  For example, we have a NAI Global client - Hertz/HERC, which is asking for sale/leaseback deals which do not involve any site selection work by NAI.  If not for being a Global client, these deals would fall under #4 above. However, based on the concept that these types of deals, and these types of clients are important to the NAI/Centres development relationship, Centres proposes the following to secure, at minimum, a fee payable to NAI Global.

1. Must be designated as an NAI Global client.
2. Fee - 2% of the sale/leaseback purchase price (i.e. - Deer Park - 2% of $2,525,000, or %50,500).  If a BTS project, then 2% of the allocated land price.
3. Timing - Fee to be paid at closing.
4. Upon the sale or financing of such project, Centres shall earn a corresponding/equivalent fee prior to an equity distribution.
5. NAI Global will remain with a 25% equity share of each deal.

Third, it seems that there are some concerns regarding the fees, etc. that are allocated to each development budget and how that will impact of overall equity share of each of the partners.  Each project will have a Total Estimated Construction Cost Summary, which will be the guideline for each deal and how that deal will perform.  One of the specific line items will be development fees, which can be a function of the total development costs, total hard costs, or a flat fee; and that will be determined on a deal by deal basis as for some deals the % will make sense and some deals a flat fee will be more in line with what is acceptable.  It is important to note that our (NAI/Centres LLC) budget may or may not be the same as the budget approved by a certain tenant, since some tenants don't allow line items that must be part of the overall LLC development budget.  In addition, Centres will be reimbursed legal fees for each deal and these will be a separate line item on each budget, which are common on any development budget.  Those two line items are the only two charges that Centres will have for these types of deals, unless of course, Ken Karl funds deals directly (without financing) and then he would be reimbursed fees that would be associated with what outside lenders would charge (our normal course is to have outside lenders for both construction and permanent).

We can go two different routes, (1) draft an amendment to the current agreement that would get much more specific in regards to fees, commissions, distributions, preferred returns, deal types, etc. or (2) Address these specific items in each LLC agreement (which is the normal course) upon the recognition of a deal officially moving forward from a development position (i.e. REC approval).

Siegel received a copy of this e-mail and he had a copy of the Alliance Agreement. He testified that he understood that an "Opportunity Entity" under that Agreement would be created by Ken Karl and Siegel assumed it would be an LLC. The plaintiff also testified that his share of the profit would be 25% of the money made on each deal but he did not know what expenses or costs would be deducted from gross proceeds. Tr. 100. He also testified that he understood that Karl could set up an LLC for each opportunity and define the terms of the LLC. Tr. 101.

Centres did not organize an LLC or any other entity with NAI for the development projects now in dispute. Mr. Armour recognized that neither the Alliance Agreement nor the Siegel letter agreement made any attempt to define the term profits. Accordingly, he proceeded to analyze the information he had and formed his opinions "based on traditional commercial use of the term in for-profit enterprises." Ex. 40 SM01. His computations were based on the books and records of Centres, including appraisal reports obtained for financing in 2007 and 2008. Mr. Armour used rental income and gain or loss from sold properties, deducting the expenses shown as actually paid by Centres. He valued the unsold properties based on capitalization rates from a study done by Linda Atkinson in 2010.

In the agreed Final Pretrial Order Regarding Damages Phase (Doc. 69) the parties identified five issues raised by Mr. Armour's report:

1. Whether a 3% management fee on gross rent on each of the seven projects should be deducted from the net profit?

2. Whether a Preferred Return to Ken Karl on each of the seven projects should be deducted from the net profit?

3. Whether a Developer Fee should be deducted from the net profit?

      4.      Whether Legal and Accounting costs on each [of] the seven projects should be deducted from the net profit?

      5.      Whether the Special Master opinion as to the value of the two unsold properties –Chesterfield and Oswego – was in error?

The plaintiff contends that in answering questions one through four there is no contractual basis for those deductions from the net profit calculated by Mr. Armour. That contention is correct but it does not determine this case. The reason for the lack of any agreement on these items is that Centres did not create an LLC for these projects because Karl and Chilton did not believe they were completed subject to the Alliance Agreement with NAI. While this Court disagreed with that position in determining when a project originated within the terms of the Alliance Agreement and the failure to create the LLC for these ventures was a breach of the Agreement, the measure of damages for that breach is what Siegel would have reasonably expected to receive if the contract had been performed by Centres.

The reasonable expectation would be receipt of a 25% equity share of the LLC formed for each project. The value of that share depends on the profits realized by the LLC and its profits would be determined by the negotiated terms of its operating agreement. As Charlton said in his e-mail to Finn, the specifics with respect to fees, commissions, distributions, preferred returns, deal types, etc., were to be addressed in each LLC agreement upon recognition of a deal officially moving forward from a development position.

There is no course of dealing among NAI, Centres and Siegel in the formation of an LLC with its operating agreement that this Court can use to estimate the result of the negotiations that would be required for each of the projects at issue. Mr. Armour's assumptions based on

industry practices are not an acceptable approach to determining net profits for these projects. The defendant has correctly characterized the NAI Alliance Agreement as an agreement to agree. It is notable that NAI has made no claim for breach of the Agreement as to the projects in question. Stated simply, the evidence does not support a reasonable estimate of what Siegel's 25% equity share would have been if the ventures had been completed under the terms that may have been included in the operating agreements.

The law does not permit the award of damages based on speculation.

The plaintiff has failed to produce evidence to support a measurement of actual damages from the defendant's breach of contract. Accordingly, a judgment will enter for the plaintiff for nominal damages of $1.00 and for an award of costs pursuant to 28 U.S.C. § 1920.

Dated: February 24th, 2012

                                              BY THE COURT:

                                              s/Richard P. Matsch
                                              _____
                                              Richard P. Matsch, Senior District Judge